## DUESENBERG MOTORS CORPORATION *v.* UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 80. Argued October 19, 1922.—Decided November 13, 1922.

1. A contractor who incurred expense under a contract to manufacture articles for the Government for use in the late war, but whose opportunity to perform and earn the contemplated profits was cut short by the sudden cessation of hostilities, the declaration of the armistice and the consequent termination of the contract in accordance with its terms, took the chances of this contingency and cannot recover damages. P. 124.

2. *Held,* in this case, that delay of the Government in furnishing necessary specifications as contemplated by a contract for the manufacture of air-plane motors of a foreign model, due to an honest but mistaken belief, shared by the contractor, that the model was perfected and adequate specifications in existence, was not an actionable breach of representation, in view of the conduct and dealings of the parties for the expedition of the work, the absence of any protest over the delay and the absence of averment that it prevented the contractor from being fully occupied with preparatory and other work under the contract. P. 123.

3. Time was of the essence for the Government, but not for the contractor.  P. 124.

56 Ct. Clms. 96, affirmed.

APPEAL from a judgment of the Court of Claims dismissing, on demurrer, a petition claiming (1) the profits that would have been made by the claimant, under a contract with the Government for manufacture of air-plane motors, but for the Government's alleged failure to supply the necessary specifications as agreed; (2) amounts paid by the claimant, because of the delay, as interest on money borrowed from the Government and private sources for use in executing the contract; and (3), if (1) cannot be recovered, the amount lost by the claimant through terminating its commercial business to accept the contract.

*Mr. George A. King,* with whom *Mr. William B. King* and *Mr. George R. Shields* were on the brief, for appellant.

The contract of January 4, 1918, for the Bugatti motors is the one upon which this suit is based.  Time was of the essence of this contract.  It required deliveries to begin in March and end in September, 1918, and held the contractor to the most rigid rule of promptness.  This provision necessarily implied that the United States must do everything required of the Government in time to permit the contractor to comply with its obligations.

The contract provision for " specifications to follow " necessarily implied that the specifications must be furnished in time to permit the deliveries to be made on time.

The failure to furnish specifications in such time—they were not complete until September 25, 1918—was a breach of contract by the United States which entitles the contractor to recover for the losses caused thereby.

These propositions rest upon elementary principles: " What is implied is as effectual as what is expressed." " Specifications to follow " implies within a reasonable

time; but this means a reasonable time within the intent of this contract, when its parts are construed together. The schedule of deliveries, beginning in March, 1918, shows that intent, as do the many expressions of the need of promptness.

Upon breach of contract by one party, the other may continue work without waiver of its right to damages. *American Smelting & Refining Co.* v. *United States,* 259 U. S. 75. See also *Mansfield* v. *New York Central R. R. Co.,* 102 N. Y. 205; *McMaster* v. *State,* 108 N. Y. 542; *Tobey* v. *Price,* 75 Ill. 645; *Merrimack Mfg. Co.* v. *Qunitard,* 107 Mass. 127; *Garfield &c. Co.* v. *Fitchburg R. R.,* 166 Mass. 119.

The principle is of special application to a war contract, where refusal to continue would have resulted in confusion in the Government's plans. The rule of law should conform to the obligation of patriotism.

The provision of the contract authorizing changes in the drawings or specifications does not include a failure to furnish specifications. The changes permitted under any such provision are changes of detail which do not essentially alter the nature of the article to be furnished. Such changes would not interfere with the general processes of production and would not operate as a complete suspension of the work. Failure to furnish specifications suspends progress to the total extent of their absence. Besides, the provision for changes apparently relied upon by the court below was in an earlier contract, and whether it was imported into this one is open to question.

The loss of the profit which the contractor would have made before the date of termination is the measure of damages for the delay which caused the loss. It is not here claimed as a loss due to the termination of the contract, but as a loss due to the delay which prevented completion before termination. It is claimed under the definition of actual damages stated in *Philadelphia, W. &*

*B. R. R. Co.* v. *Howard,* 13 How. 307. *St. Louis Beef Co.* v. *Casualty Co.,* 201 U. S. 173; *United States* v. *Behan,* 110 U. S. 338; *United States* v. *Speed,* 8 Wall. 77; *Roehm* v. *Horst,* 178 U. S. 1.

The plaintiff is entitled to recover the interest paid to the Government on the loans it made the plaintiff, because, by delaying the specifications, it prevented complete deliveries and payment to the contractor of cost and profit, from which the borrowed money would have been paid. This comes clearly within the rule of damages stated in the cases already cited. *Hattiesburg Lumber Co.* v. *Herrick,* 212 Fed. 834; *Bank of Columbia* v. *Hagner,* 1 Pet. 455; *Guerini Stone Co.* v. *Carlin Construction Co.,* 248 U. S. 334.

The payment of interest on a bank loan, made necessary by the same default, is no less a direct item of damage to the contractor than the payment of interest to the United States. The cost of revenue stamps on the notes, also claimed, follows the same principle.

The provisions of § 177, Jud. Code, forbidding judgment in the Court of Claims for interest upon a claim, have no application to this item.

When appellant undertook this contract, it had to discontinue its commercial business and suffered a loss in so doing. It was expected that this loss would be made good out of the fixed profit on the completed motors, as well as the uncertain profit on spare parts. The failure of the contractor to realize the entire profit and thus absorb the loss was due to the failure of the United States to furnish the specifications on time. That the loss still rests upon the contractor is therefore the fault of the United States and the contractor should be reimbursed therefor. See *Baird* v. *United States,* 5 Ct. Clms. 348; affd. 131 U. S. appendix cvi. If the contractor is allowed the amount of its profits as damages under the first item, this item is not allowable, as it is discharged by the profits.

The United States is entitled to credit upon it in the proportion which the profits actually received bear to the total profits which would have been received had the default of the United States not occurred.

*Mr. Alfred A. Wheat,* Special Assistant to the Attorney General, with whom *Mr. Solicitor General Beck* was on the brief, for the United States.

MR. JUSTICE MCKENNA delivered the opinion of the Court.

Action in the Court of Claims against the United States for expenses in endeavoring to perform certain contracts with the United States made during the war with Germany, or for anticipated profits.

The contracts were for aeronautical equipment for war purposes. There were a first and primary contract and seven other contracts called supplemental agreements. The latter contained modifications of the first or primary contract, and each agreement contained modifications of those which preceded.

The first or primary contract, dated November 20, 1917, provided for 500 United States standard twelve-cylinder engines, sometimes referred to as Liberty engines. By an agreement dated December 11, 1917, the number was increased to 1,000. By another agreement dated January 4, 1918, the type of motor was changed and a motor called the Bugatti motor was substituted; and there were other agreements.

From this general statement it will be seen that the contract and agreements are determining elements in the claims sued upon. A full recital of them, however, would extend this opinion to an embarrassing length. We shall confine ourselves, therefore, to those which we regard of determining pertinence.

Upon demurrer of the United States, the Court of Claims decided the contractor entitled to no relief and dismissed its petition. This action is contested, and it is earnestly insisted that the contracts made time their essence and required speed and dispatch from the contractor, and demanded in their performance precedence upon all other work, involving necessarily, sacrifice and expense upon the part of the contractor. And time, it is contended, being of the essence of the contracts, this necessarily implied that the United States must have done everything to permit the contractor to comply with its obligations. The Government, however, was delinquent; and it is alleged that " the drawings and specifications referred to in the contract (Exhibit A) as being attached thereto (but which were not in fact so attached) were furnished piece-meal from time to time but not so as to enable the claimant to enter into quantity production; and the only work which was practicable under said contract was in making extensive alterations in the plant of claimant company to adapt it to the uses of the Government for the purpose of carrying out the contract (Exhibit A), to assemble a competent engineering staff, and to make other preparations for the performance of said contract, all of which the claimant did at great expense."

And further delinquency is charged in not performing the agreement which substituted the Bugatti motors, and Article I of the agreement is quoted as follows:

" That, subject to all the provisions of Article I in said contract No. 2318 contained, the Contractor shall make for the Government, instead of the articles described in Article I of said contract, two thousand (2,000) Bugatti motors, and such spare parts for said motors as the Government may order from time to time during the period of the construction of said motors, in accordance with specifications to follow."

The specifications were not furnished, it is said, until September 25, 1918; and that the delay was a breach of

the contract; and the contractor is entitled to recover for the losses caused thereby.

To this the Court of Claims answered that the contract contemplated a revision of the schedule (times of delivery) in regard to the engines. The provision to which that purpose was attributed is, that " in view of the present uncertain factors inherent in the articles, and in the establishment of the industry of producing them, it is understood that this schedule may require revision, . . ." The schedule designated June, 1918, as the month of complete production.

Changes were provided for in another article, and by still another it was provided that if in the opinion of the Chief Signal Officer of the United States the public interests so required, the Government might, upon thirty days' notice, terminate the contract. And there was provision for settlement of disputes.

Dates are important to be considered. The supplemental contract in which Article I appears, and which adopts Article I of the first contract, is dated January 4, 1918. Another agreement which was supplementary to that agreement was dated January 15, 1918, and still another dated February 11, 1918.

In none of these agreements, continuing as they did the obligations of the parties to them and the means of their performance, is there a word of complaint that the Government had been or was delinquent on account of not furnishing specifications or in any way. In the agreement of February 11, 1918, in Article II, it is provided that:

" In the interest of both parties hereto and in order to expedite the delivery of the said supplies, the Government will advance to the contractor under the Principal Agreement the sum of Four Hundred Thousand Dollars ($400,000) on the terms and security hereinafter mentioned, and will make payment directly to the contractor by check dated February 25, 1918."

There was another agreement, dated February 14, 1918, which continued in effect, except as modified, all that preceded. There was no protest or complaint of any kind, no accusation of default or delay on the part of the Government.

There was a seventh agreement, made September 26, 1918, and another, made October 23, 1918, for advance payments to the contractor.

The agreements are of significant strength. Their legal effect and that of the contract cannot be determined by any one provision but the totality of them must be regarded and their relations and purposes.

A war of magnitude was waging. The Government was eager for efficient instrumentalities and the contractor was enticed by the profit of their manufacture. The matters were urgent, but they were beset with contingencies. The Government could terminate the contract in the interest of the public welfare; and the war might cease. The latter did happen. However, before it happened and, before, it may be, there were signs of its happening, there were dealings and adjustments of preparation between the Government and the contractor. They took care of, and were intended to take care of, changing purposes, and no dissatisfaction was expressed. One of the changes was, as we have said, from the construction of 500 Liberty motors to 1,000, the completion and delivery of which was to be in June, 1918, and, as we have said, another change was the substitution of 2,000 Bugatti motors for the Liberty engines, and for such spare parts as the Government might order from time to time; the motors to be delivered by September, 1918. By the supplemental agreements which provided for those changes, it was also provided that their cost was to be paid by the Government, and the profit of the contractor was changed from $625 for each article to $750, and the Government agreed to advance the contractor $1,250,000, to be repaid with interest at 6%.

Upon this change to the Bugatti motors comes the first claim of the contractor, based upon Article I of the agreement of January 4, 1918, by which it was provided as follows: "That subject to all the provisions of Article I in said contract No. 2318 contained, the Contractor shall make for the Government, instead of the articles described in Article I of said contract, two thousand (2,000) Bugatti motors, and such spare parts for said motors as the Government may order from time to time during the period of the construction of said motors, *in accordance with specifications to follow.*" (Italics ours.)

No time is specified. It is, however, contended that necessarily a reasonable time must have been intended and was not observed. The specifications, it is alleged, did not follow until September 25, 1918, when the entire time for the production of the motors was within a few days of expiring, whereby it became impossible to produce any of the articles within the time limit of the contract.

It is not alleged, however, that the failure to furnish the specifications was willful on the part of the Government or fraudulent. On the contrary, it is alleged, that there was a belief upon the part of the government officers by whom and under whom the supplemental agreement, was made that there were in existence complete specifications of the articles, which needed only to be obtained from France; that the motors had passed the experimental stage and were ready for production. It is, however, alleged that the statements in the contract operated as a representation to the contractor that such was the fact, and that production in quantity could begin at or shortly after the entry into the agreement. It is further alleged that, when the first motor was received shortly after the date of the agreement, it developed that extensive changes would be necessary, and the contractor was directed to proceed meanwhile actively with production

on the separate parts to the extent possible in view of the undeveloped character of the specifications of the engine. This was done in conjunction with the officers of the Government.

It will be observed that it is not alleged that the belief of the government officers was not consistently entertained nor that the contractor did not share it. Nor is it said that the work on the separate parts and the preparations for the performance of the contract did not engage the contractor's time. Indeed, the fact is that, by January 4, there were changes to the advantage of the contractor, and again by the agreement of February 11, 1918, and another as late as October 23, 1918, by which the Government agreed to advance to the contractor $1,250,-000. And still no complaint. On the contrary there was acceptance of assistance.

It is manifest there were uncertainties on both sides and that, as they developed, preparations were necessary to meet them, and, in meeting them, the contractor did not regard the Government in any way delinquent. It was the abrupt and unexpected suspension of hostilities and the declaration of an armistice that was the cause of loss to the contractor, and the disappointment of profits from its contracts which it was preparing to realize and would have realized. But it took that chance and has not now a legal claim against the Government for reimbursement of its outlays. We need not distinguish between the outlays nor dwell upon them. They were outlays of the speculation, and subject to sacrifice and loss with its disappointment.

We have seen that counsel make much of the effect of the Government's urgency, and, it is contended, time in consequence became an essential of the contract. This, the contention is, influenced the contractor and necessarily determines the obligation of the Government. The Government was undoubtedly urgent, made so by its seri-

ous situation and tremendous responsibilities, but such was not the situation of the contractor. Time to per- form its contract was all that was necessary to it, and but for the armistice it would have had time. If the armi- stice could have been foreseen, the relative situations might have been different. Expedition would not then have been exigent to the Government's purposes, but would then have been necessary to the contractor, if profits were to be realized from the production of the motors. There was no prophecy of the armistice—its sudden hap- pening terminated the further execution of the con- tractor's undertaking, preventing, as we have said, the realization of profits. And, we repeat, this chance the contractor took and must abide the result. ·

*Judgment affirmed.*